The Full Commission has reviewed the prior Order and prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Young and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioners denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employment relationship existed between the plaintiff and defendant-employer at all relevant times herein.
3. The carrier on the risk is Liberty Mutual Insurance Company at all times relevant herein.
4. The parties stipulated that the date of the plaintiffs injury by accident was July 13, 1996.
5. The parties stipulated that the plaintiff injured her left lower leg in the calf area when she turned suddenly while walking down the hall at her place of employment with the defendant-employer on July 13, 1996.
6. The parties stipulated to the plaintiffs medical records from Kaiser Permanente, and Presbyterian Hospital.
7. The issues presented are:
a) Whether the plaintiffs medical condition of DVT is causally related to the plaintiffs injury by accident to her left leg sustained in the course of her employment with the defendant-employer on July 13, 1996.
b) Whether the plaintiff is entitled to any benefits under the North Carolina Workers Compensation Act.
 ***********
Based upon all the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the plaintiff was a 53-year-old high school graduate. The plaintiff is a Certified Nurses Assistant (CNA) and at the time of the hearing before the Deputy Commissioner was still employed as a CNA with the defendant-employer. Her average weekly wage was $243.60, yielding a compensation rate of $162.40.
2. In 1986, the plaintiff opened her own beauty shop in which she worked part-time until 1998. The plaintiff worked alone about twelve hours each week in her beauty shop. The plaintiff closed her business in 1998 due to her DVT and her doctors recommendation.
3. On or about July 1994, the defendant-employer hired the plaintiff as a CNA. The plaintiffs job duties included providing nursing assistance to the elderly.
4. On July 13, 1996, the plaintiff was working for the defendant-employer as a floater. The plaintiff was assigned to help lift a patient off of the floor. As the plaintiff helped to lift the patient, the plaintiffs foot became stuck on the carpet as she turned suddenly and she injured her lower left leg in the calf. She reported this incident to Pat Hasty, L.P.N., and went home to soak her leg. The foot becoming stuck on the carpet as she turned suddenly constituted an accident and the resulting injury was an injury by accident within the meaning of the Workers Compensation Act.
5. Plaintiff reported to work on July 14, 1996, but her leg pain worsened. She left work and presented to Dr. Jason Ratterree complaining of sudden pain in her left calf, tenderness, but no swelling. Dr. Ratterree diagnosed muscle strain and prescribed medication, an ace bandage, crutches and ordered her to stay off of her leg for three days. Plaintiff returned home and immobilized her leg for seven days.
6. Plaintiff returned to work on July 22, 1996.
7. Prior to July 13, 1996, the plaintiff had a history of hypertension and took medication to control her blood pressure. The plaintiff was also under a doctors care to aid weight loss. The plaintiff testified that in 1995, she began Estrogen Replacement Therapy which required that she take the potentially blood clotting medication, Premarin.
8. The plaintiff continued to work for the defendant-employer, but on September 3, 1996, the plaintiff went to the doctor for dehydration and a urinary tract infection. While at the doctors office she had an acute onset of pain and swelling in her left lower leg and had to be hospitalized for three days. Among other things, the hospital admission note said:
"This is a 49-year-old white female with a history of hypertension and fibrocystic breast disease who had a previous injury to her left calf approximately July, 1996 when she had slipped and strained it. Since then she has had persistent pain, which was treating conservatively. On the day of admission she had increasing pain and swelling, more than had been present previously. She subsequently was referred to radiology for Doppler study which revealed extensive left lower extremity deep vein thrombosis.
Upon the plaintiffs release, she was referred to Dr. Dietlinde W. Zipkin, an internist at Kaiser Permanente.
9. The plaintiff continued to treat with Dr. Zipkin and on November 16, 1996, she returned to work on light duty. She continued to experience leg pain and was hospitalized again on or about June 16, 1997 for her chronic DVT. She returned to work as a CNA for the defendant-employer on July 11, 1997.
10. Dr. Ratterree testified that it was a reasonable possibility that the twisting incident of July 13, 1996 caused the deep venous thrombosis. He was confused, however, that the DVT had been diagnosed shortly after July 13. The first time it was diagnosed was after a Doppler test at Presbyterian Hospital during the September 3-6, 1996, admission. When he first saw her the day after the episode Dr. Ratterree wrote presciently in his "impression:
"Acute left leg pain, most probably gastrocnemius. However, I did discuss that this can also be DVT in etiology had not the patient told me that there was sudden pain during slight traumatic episode. However DVT studies and further workup would be needed should symptoms persist or worsen. However, if she has increased pain she is to return here for a Doppler study of the lower leg. Importance of follow-up stressed.
His confusion that the DVT had been diagnosed prior to September 3 was demonstrated by these passages from his deposition:
[Y]ou have a lot of things that you fit into time spectrums and occasionally you have somebody come in that has a different time spectrum, but its reasonably possible. But I can say that Ive been at this eight years, Ive never seen anybody come in that quick with that type history and have that happen."
My impression was, by the history, that she probably had pulled a muscle and I listed that in the impression. However, anytime somebody has calf pain deep venous thrombosis is a possibility. However, I thought it was a low possibility at that time because she had just had a sudden acute injury that usually is not followed after just something sudden. It can develop over time, but I was seeing her right after the event.
He also said that swelling usually is present in DVT yet he reported no swelling of her leg upon examination.
11. Dr. Zipkin rendered the opinion that it was possible that the plaintiffs twisting injury could have caused her DVT, "but I dont know that it did.
12. Vascular damage is a main cause of venous thrombosis. Deep venous thrombosis is a disorder involving a thrombus or blood clot in one of the deep veins of the body, causing an obstruction of the blood flow and often resulting in the pooling of blood in a lower extremity. A trauma or contusion may cause damage to the innermost layer of the vein, slowing the flow of blood at that point, which stimulates the formation of a blood clot, or thrombus. The thrombus obstructs blood flow further and may, if large enough, occlude the channel entirely. Immobility of the extremity, which reduces the blood flow to the limb, further promotes the growth of thrombi. Damage to the innermost layer of the vein constitutes permanent injury to an internal organ or part of the body for which no compensation is payable under any other subdivision of N.C. Gen. Stat.97-31(24).
13. The earliest sign of venous thrombosis is localized tenderness in the injured area. As the thrombus develops, the patient experiences pain and then swelling as the blood pools in the affected limb.
14. The diagnosis of deep venous thrombosis of the calf is often difficult to make at the bedside. This is so because only one of multiple veins may be involved, allowing adequate venous return through the remaining patent vessels. The most common complaint is calf pain.
Risk of thrombosis is increased following trauma. Immobilization, regardless of the underlying disease, is a major predisposing cause of venous thrombosis. The noninvasive test used most often to diagnose deep venous thrombosis is two-dimensional imaging and pulse-wave Doppler interrogation.
15. The Full Commission finds that the twisting incident of June 13, 1996, caused plaintiffs deep venous thrombosis. This condition had not been diagnosed or suspected prior to that date, the first treating physician suspected that DVT might develop, trauma and immobilization are two of the three recognized causes of DVT (and here the plaintiff had trauma to her leg followed by seven days of immobilization in bed), and both physicians who testified rendered opinions that the twisting incident could have caused the deep venous thrombosis, although neither was willing to say without equivocation that it did. Plaintiff had no swelling when examined on June 14, 1996, the day after the twisting incident but developed swelling by September 3 when DVT was first diagnosed by the use of a Doppler.
16. While defendants suggested that other causes led to the development of plaintiffs DVT, the competent evidence of record indicates that no other factor or any combination thereof caused her DVT. In addition to vascular damage, stasis (inactivity) and hypercoagulability (propensity of the blood to clot) may also cause DVT. Immobility factors include surgery, obesity, and inactivity. Hypercoagulability factors include cancer and the use of oral contraceptives. While defendants suggested that these other factors, but not the accident, were the source of plaintiffs DVT, based upon the medical literature, evidence of record and doctors testimony the Full Commission finds that these other factors could not have caused plaintiffs DVT.
17. Because of her compensable injury by accident plaintiff was unable to earn any wages on the following periods: from July 14, 1996 through July 21, 1996, from September 2, 1996 through November 16, 1996, and from June 10, 1997 through July 16, 1997. She thus is entitled to 17 weeks and 1 day of temporary total disability compensation at the rate of $162.40 per week, subject to an appropriate offset for any employer-funded disability payments. She must wear compression hose on an indefinite basis, each pair costing $80.00. She drove 53 miles round trip from her home to her doctor an estimated one hundred times, for a total of over 5300 miles.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. On July 13, 1996, the plaintiff sustained an injury by accident to her left leg arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. 97-2(6).
2. An experts opinion that a particular cause "could or might have produced the result indicates that the result is capable of proceeding from a particular cause within the realm of reasonable probability. A result in a particular case may stem from a number of causes. All that is necessary is that experts express an opinion that a particular cause was capable of producing the injurious result. Alva v. Charlotte MecklenburgHospital Authority, 118 N.C. App. 76, 80 (1995), citing Lockwood v,McCaskill, 262 N.C. 663,138 S.E.2d 541 (1964).
3. The plaintiff has the burden of proof in each and every element of compensability. Henry v. A.C. Lawrence Leather Co., 231 N.C. 477,57 S.E.2d 760 (1950). In the instant case, the competent evidence in the record supports the plaintiffs contention that her DVT was causally related to her twisting injury of July 13, 1996.
4. The plaintiffs DVT was the result of the plaintiffs injury by accident to her left leg arising out of and in the course of her employment. N.C. Gen. Stat. 97-2(6).
5. The plaintiff is entitled to have the defendants pay for all of her medical expenses as a result of her injury by accident of July 13, 1996. N.C. Gen. Stat. 97-25; N.C. Gen. Stat. 97-2(19); these medical expenses are likely to continue the remainder of her life. N.C. Gen. Stat. 97-25.1.
6. Damage to the innermost layer of the vein constitutes permanent injury to an internal organ or part of the body for which no compensation is payable under any other subdivision of N.C. Gen. Stat. 97-31(24).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Subject to attorneys fees set out below, defendants shall pay $20,000.00 to plaintiff pursuant to N.C. Gen. Stat. 97-31(24) for permanent injury to an internal organ or part of the body for which no compensation is payable under any other subdivision of N.C. Gen. Stat.97-31(24). This amount has accrued and shall be paid in a lump sum. Defendants shall pay interest at the rate of 8 percent per year on such amount from the date of the hearing before the Deputy Commissioner until paid.
2. Subject to attorneys fees set out below and to appropriate offset for any disability payments resulting from an employer-funded disability plan, defendants shall pay 17 and 1/7 weeks of temporary total disability compensation at the rate of $162.40 per week. This amount has accrued and shall be paid in a lump sum. Defendants shall pay interest at the rate of 8 percent per year on such amount from the date of the hearing before the Deputy Commissioner until paid.
3. Defendants shall pay 25% of the compensation due under paragraphs 1 and 2 above directly to plaintiffs attorneys. Plaintiff shall receive all of the interest.
4. Defendants shall pay the plaintiffs medical expenses incurred or to be incurred for the plaintiffs injury by accident. This includes but is not limited to compression hose and travel to and from medical exams and treatment. Defendant is to continue paying medical expenses so long as may reasonably be required to effect a cure or give relief.
5. Defendants shall pay the costs, including expert witness fees of $165.00 to Dr. Ratterree and $440.00 to Dr. Zipkin.
This 30th day of January 2001.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER